UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

STEVIE BRADLEY,

      Plaintiff,

         v.                         CAUSE NO. 3:21-CV-867-JD-MGG

PEPPERS, et al.,

      Defendants.

OPINION AND ORDER

Stevie Bradley, a prisoner without a lawyer, filed a complaint. ECF 1. "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quotation marks and citations omitted). Nevertheless, under 28 U.S.C. § 1915A, the court must review the merits of a prisoner complaint and dismiss it if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief.

Bradley alleges he was brought into custody at the St. Joseph County Jail by Detective Emily Eades on September 14, 2021. Bradley claims Detective Eades was "working under the guise" of a Victim Impact Assistant when in reality she was the arresting detective in the criminal matter eventually brought against him.[1] Bradley

---

[1] *See State of Indiana v. Bradley*, filed Sept. 15, 2021, cause no. 71D02-2109-F1-000020, available online at: https://public.courts.in.gov/mycase/#/vw/Search (last visited May 16, 2022).

agreed to talk to her privately, but when he realized she was asking him a line of

questions that could incriminate himself, he requested an attorney. Detective Eades

expressed irritation with Bradley by using "facial expression and body language," and

she told him he "won't get away with this that easy." ECF 1 at 2. When Bradley asked

her whether she was mad at him for wanting an attorney present, she told him, "We're

done here." *Id*. at 3. Bradley was then taken to a booking area. Detective Eades

whispered briefly with Deputy Staatz, the booking officer, and then left the room with a

"menacing look upon her face." *Id*.

Deputy Staatz asked him about his gang affiliations, to which Bradley replied

that he had none. When asked whether he was taking any medications, Bradley told

Deputy Staatz he was taking prescription medication—Depakote for mood stabilization

and "aggressive mood swings" and Risperdal for "hearing voices." *Id*.[2] Bradley insists

he never showed any mood swings or aggressive behavior during the booking process.

Two unidentified deputies then changed him into "County Orange" clothes and

handcuffed him. Bradley feared for his life because they didn't tell him where he was

---

[2] Valproic acid—the generic of Depakote—is used to treat "mania (episodes of frenzied, abnormally excited mood) in people with bipolar disorder (manic-depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods)." *See* National Library of Medicine, MedlinePlus, available at: https://medlineplus.gov/druginfo/meds/a682412.html (last visited May 16, 2022). Risperidone—the generic of Risperdal—is used to treat "the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions) in adults and teenagers 13 years of age and older. It is also used to treat episodes of mania (frenzied, abnormally excited, or irritated mood) or mixed episodes (symptoms of mania and depression that happen together) in adults and in teenagers and children 10 years of age and older with bipolar disorder (manic depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods). Risperidone is also used to treat behavior problems such as aggression, self-injury, and sudden mood changes in teenagers and children 5 to 16 years of age who have autism (a condition that causes repetitive behavior, difficulty interacting with others, and problems with communication)." *See* National Library of Medicine, MedlinePlus, available at: https://medlineplus.gov/druginfo/meds/a694015.html (last visited May 16, 2022).

going. He was taken to G-Pod where he was put in administrative segregation status, where he remained for approximately one month.  While in segregation, Bradley had to remain in his cell for twenty-three hours a day. On October 13, 2021, he was moved to the general population, where he is housed today. He has not experienced any aggressive mood swings since his arrival at the jail.

During his time in segregation, Bradley filed a grievance challenging his placement. After three weeks, Sergeant Peppers—the head of the classification department—responded to his grievance and noted he had been housed in segregation "for the safety of others" based on Bradley's comments to Deputy Staatz regarding his medication. *Id.* at 5 (*see also* ECF 1-1). He claims Sgt. Peppers "deprived me of my right to the Grievance Procedure, where he did so answer a grievance that was written directly against his person." *Id.* at 6. Bradley has sued Detective Eades, Deputy Staatz, and Sgt. Peppers for monetary damages.

"The Sixth Amendment right to counsel attaches at the initiation of adversary judicial proceedings, whether by way of formal charge, indictment, information, or arraignment." *Watson v. Hulick*, 481 F.3d 537, 542 (7th Cir. 2007). This right is applicable at "any critical stage of the prosecution." *Id.* (citing *Jackson v. Miller*, 260 F.3d 769, 775 (7th Cir. 2001)). However, interrogating a suspect "before the filing of a charge, without more, does not trigger the right to counsel." *Id.* (citing *First Def. Legal Aid v. City of Chicago*, 319 F.3d 967, 970–71 (7th Cir. 2003)).

According to the complaint in this case, Bradley had not yet been indicted nor had charges been formally brought against him during his encounter with Detective

Eades. Moreover, even if they had, he admits Detective Eades ended the questioning upon his request for counsel, brought him to the booking area, and left. As noted by the Seventh Circuit, "even persons in custody, who *do* have a constitutional right to counsel, have no right to notice that a lawyer is at the door, or to meet with counsel in the interview room. Their right is to terminate the interrogation, not to have counsel on the spot." *First Def. Leg. Aid*, 319 F.3d at 971 (emphasis in original). The fact that Detective Eades appeared angry or menacing as she exited the room does not suggest Bradley's constitutional rights were violated. The same is true as to his interaction with Deputy Staatz. During the booking process, she asked him about gang affiliations and medications. These routine intake questions did not involve a "critical stage of the prosecution," so even if he had asked Deputy Staatz to have counsel present during this timeframe—which he has not alleged—his right to counsel was not implicated. *See e.g. Watson*, 481 F.3d at 542. Thus, Bradley has not stated any Sixth Amendment claims.

Bradley also takes issue with his initial placement in administrative segregation rather than the general population. The Fourteenth Amendment provides state officials shall not "deprive any person of life, liberty, or property, without due process of law . . .." U.S. Const. amend. XIV, § 1. That said, due process is only required when punishment extends the duration of confinement or imposes "an atypical and significant hardship on him in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). "[I]nmates have no liberty interest in avoiding transfer to discretionary segregation—that is, segregation imposed for administrative, protective, or investigative purposes." *Townsend v. Fuchs*, 522 F.3d 765, 771 (7th Cir.

4

2008) (citing *Lekas v. Briley*, 405 F.3d 602, 608–09 & 608 n.4 (7th Cir. 2005)

("[R]eassignment from the general population to discretionary segregation does not

constitute a deprivation of a liberty interest.")); *see also DeTomaso v. McGinnis*, 970 F.2d

211, 212 (7th Cir. 1992) ("[P]risoners possess neither liberty nor property in their

classifications and prison assignments."); *Healy v. Wisconsin*, 65 Fed. Appx. 567, 568 (7th

Cir. 2003) ("[I]nmates do not have a protected liberty interest in a particular security

classification.") (citing *Sandin*, 515 U.S. at 486).

Although later cases have questioned the conclusion that placement in

nonpunitive segregation can "*never* implicate a liberty interest," *see Williams v. Brown*,

849 Fed. Appx. 154, 157, n.3 (7th Cir. 2021) (emphasis added), timing plays a part in the

analysis, even when conditions are significantly harsher. *See e.g. Marion v. Columbia

Correction Inst.*, 559 F.3d 693, 697-98 & nn.2–3 (7th Cir. 2009) (collecting cases that held

segregation of two to ninety days does not trigger due process concerns and stating, "In

a number of other cases, we have explained that a liberty interest may arise if the length

of segregated confinement is substantial *and* the record reveals that the conditions of

confinement are unusually harsh.") (emphasis added); *Lekas v. Briley*, 405 F.3d 602, 612

(7th Cir. 2005) (finding that up to ninety days in segregation does not affect liberty); *see

also Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) (recognizing "duration" is a component

that plays a part in determining whether a liberty interest exists).

Here, Bradley has not alleged he was placed in the segregation unit as part of any

disciplinary proceeding. Rather, according to the complaint, his placement was

implemented due to either the type of criminal charges filed against him (according to

the deputies who took him from the booking area to his cell) or for the safety of the

other inmates due to his medication admissions and mental disability (according to Sgt.

Peppers). Either way, according to his own allegations, the placement was

administrative in nature. Moreover, although he claims he was constrained to his cell

for twenty-three hours a day, these allegations do not amount to an atypical and

significant hardship in relation to the ordinary incidents of prison life, especially

considering he was moved to the general population less than a month later. *See Sandin*,

515 U.S. at 484; *Marion*, 559 F.3d at 697-98 & nn.2–3 (7th Cir. 2009) (collecting cases

regarding timing). Thus, Bradley has not stated any Fourteenth Amendment claims

regarding his cell placement.

Finally, Bradley complains Sgt. Peppers violated his rights when he denied his

grievance three weeks after it was field. However, these allegations do not state a claim.

*See Est. of Miller by Chassie v. Marberry*, 847 F.3d 425, 428 (7th Cir. 2017) ("[P]rison

officials who reject prisoners' grievances do not become liable just because they fail to

ensure adequate remedies.") (citing *Burks v. Raemisch*, 555 F.3d 592 (7th Cir. 2009)); *see

also Grieveson v. Anderson*, 538 F.3d 763, 770 (7th Cir. 2008) (noting that there is not a

Fourteenth Amendment substantive due-process right to an inmate grievance

procedure); *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996) ("Accordingly, a

state's inmate grievance procedures do not give rise to a liberty interest protected by the

Due Process Clause.").

Bradley's complaint does not state any valid claims. "The usual standard in civil

cases is to allow defective pleadings to be corrected, especially in early stages, at least

6

where amendment would not be futile." *Abu-Shawish v. United States*, 898 F.3d 726, 738

(7th Cir. 2018). However, "courts have broad discretion to deny leave to amend where .

. . the amendment would be futile." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 432 (7th

Cir. 2009). For the reasons previously explained, such is the case here.

For these reasons, this case is DISMISSED under 28 U.S.C. § 1915A.

SO ORDERED on May 17, 2022

/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT